**BEFORE THE UNITED STATES**
**JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| **IN RE:** Paycheck Protection Program ("PPP") Agent Fees Litigation | MDL Docket No. 2950 |

**RESPONSE IN OPPOSITION TO MOTION FOR TRANSFER OF ACTIONS**
**PURSUANT TO 28 U.S.C. § 1407**

Undersigned Defendants,[1] by their counsel and pursuant to Rule 6.1(c) of the Rules of

Procedure for the United States Judicial Panel on Multidistrict Litigation, oppose Alliant CPA

Group LLC's ("Movant") Motion for Transfer of Actions to the Northern District of Georgia

pursuant to 28 U.S.C. § 1407 for a Coordinated and/or Consolidated Proceeding (the "Motion").

## I.    INTRODUCTION

The Motion is one of four pending before the Panel in which various plaintiffs' counsel

have tried to create the appearance of complex litigation by filing putative class actions across

the country stemming from the recently enacted Coronavirus Aid, Relief, and Economic Security

Act, Pub. L. No. 116-136 (the "CARES Act" or the "Act"), and its small business lending

program, known as the Paycheck Protection Program ("PPP").

In the lawsuits underlying the Motion, Movant and other plaintiffs allege that various

defendant lenders (including unnamed "Doe Lenders") failed to pay fees to purported agents—

such as accountants, a tax preparer, a plaintiffs' personal injury law firm, and even a video tape

---

[1] Synovus Bank; Ameris Bank; Celtic Bank Corp. d/b/a Celtic Bank, MUFG Union Bank N.A., and MUFG Americas Holding Co.; City National Bank; Fifth Third Bank, National Association and Fifth Third Bankcorp; First National Bank of Pennsylvania and F.N.B. Corp.; Harvest Small Business Finance, LLC; Huntington Bancshares Incorporated and The Huntington National Bank; KeyCorp and KeyBank N.A.; Live Oak Banking Company; MidFirst Bank; The North Side Bank & Trust Company; PNC Financial Services Group, Inc. and PNC Bank N.A.; ServisFirst Bank; Truist Bank and Truist Financial Corporation; and U.S. Bancorp and U.S. Bank National Association.

duplicating company—that allegedly assisted small businesses in applying for PPP loans.  Those cases, now known to the Panel as the Agent Fee Cases, were filed in federal and state courts nationwide.  *See* JP Morgan Chase Bank, N.A.'s Consolidated Response in Opposition at 2, *In re JPMorgan Chase Paycheck Prot. Plan Litig.*, No. 2944 (J.P.M.L. May 29, 2020), ECF No. 69.  Ten of the twelve cases referenced in the Motion were filed by the same plaintiffs' firms.  The scope of this proposed MDL is breathtaking.  Unlike other proposed MDLs, which concern another aspect of the CARES Act and/or seek to bring together suits involving a single financial institution, this Motion seeks to sweep into one centralized proceeding actions against some 80 banks ranging from the largest in the country to smaller community banks, and every variety in between.  Not surprisingly, the number of PPP loans issued by these banks range from in the hundreds to far more than a hundred thousand.  The vast majority of defendants have been sued in only one or two of the lawsuits.

The only thing that these cases have in common is a baseless legal theory.  Neither the CARES Act nor its implementing regulations grant self-declared "agents" the claimed entitlement to be paid by lenders.  Even if it did, the statute does not provide a private right of action for agents to enforce that supposed entitlement.  Many of the state law claims asserted by the plaintiffs likewise fail because they are based on the false theory that federal law creates an entitlement to fees.  Others fail for additional reasons that are specific to the various state law claims asserted.

The *facts* at issue are extremely case-specific.  This is not surprising given the number of different financial institutions sued.  Thus, if the suits survive motions to dismiss, which they should not, plaintiffs' claims will depend entirely on myriad factual questions unique to each lender and each alleged agent.  Whether a particular agent is entitled to a particular fee may

depend on the particular policies and procedures of the bank through which the loan was funded; whether the agent made a pre-suit demand for a fee; the interaction, if any, between the bank and the agent; whether the particular services provided were reasonable and the fee clamed justifiable; whether the agent can provide documentation demonstrating such work; and other fact-intensive issues.  The complaints themselves affirm that the facts are different as to each bank because they allege that the banks have adopted differing policies about paying agent fees. For example, the complaints themselves allege that some banks have stated upfront that they will not pay agent fees, others allegedly have paid less than the maximum amounts specified by the SBA's PPP rule (to which plaintiffs claim an entitlement irrespective of whether the work was reasonable and the claimed fee justifiable), and still others are allegedly making it difficult for the agents to obtain fees, which plaintiffs equate with "effective denial."  *See, e.g.*, Mot. Ex. A (*Alliant* Compl. ¶ 46), ECF 1-6.

Transfer of these actions would not, and is not intended to, aid in the resolution of these varied factual questions.  Transfer would also not be convenient for the parties or efficient in any way.  The obvious truth is that plaintiffs' counsel have filed multiple cases in an attempt to create the appearance that centralization is appropriate.  The Panel is "typically hesitant to centralize litigation on an industry-wide basis," *In re AndroGel Prods. Liab. Litig.*, 24 F. Supp. 3d 1378, 1379 (J.P.M.L. 2014), but that is precisely what Movant seeks.  There is a good reason for that rule:  Industry-wide MDLs impose significant litigation costs on defendants who are sued in only a small number of actions.  The Panel should deny the Motion.

## II.    BACKGROUND

### A.  The Enactment of the CARES Act and PPP

On March 27, 2020, President Trump signed the CARES Act into law.  The Act directed the Small Business Administration ("SBA") to establish a new loan program for small

businesses, called the PPP.  The PPP was created under Section 7(a) of the Small Business Act, which provides the statutory authorization for the federal government's primary small business loan program.  15 U.S.C. § 636(a)(36).  Under the PPP, the SBA guarantees 100 percent of loans made by eligible lenders to eligible borrowers.  *Id.* § 636(a)(2)(F).  SBA reimburses lenders for making PPP loans through a loan-processing fee, with the reimbursement amount determined based on the size of the loan.  *See id.* § 636(a)(36)(P)(i).  The application for a PPP loan is straightforward.  It is two pages in length, including signature lines, and contains just eight questions.  It contains no field to identify agents.  The application was designed to be simple so that the overwhelming majority of small businesses, including non-profits and sole proprietorships, could complete the application without assistance. [2]

The underlying cases concern the role of *agents* in the PPP.  Congress delegated to the SBA the authority to set a maximum limit for fees paid to agents who assist borrowers with preparing a PPP loan application, providing that "[a]n agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator."  *Id.* § 636(a)(36)(P)(ii).  Congress did not otherwise modify the existing regulatory framework applicable to agents assisting lenders and borrowers with Section 7(a) loans or delegate to the SBA the authority to do so.  *See id.* § 636(a)(36)(B).  *Congress did not delegate to the SBA authority to permit borrowers to hire agents at lenders' expense.*

---

[2] The Association of International Certified Professional Accountants ("AIPCA") explained that it was their "understanding that many [CPA] firms do not intend to charge clients for the PPP application process for several reasons," including because "[t]he application itself is fairly straight forward and can be completed by the small business." AIPCA, *Small Business Loans Under the Paycheck Protection Program: Issues Related to CPA Involvement* (2020) (*hereinafter* "AICPA Report") [attached hereto as Ex. A].

On April 15, 2020, the SBA promulgated the First Interim Final Rule, 85 Fed. Reg. at 20,811 ("First IFR"), that, among other things, exercised the SBA's statutory authority to establish monetary limits on agent fees.  The First IFR posed the question, "*Who pays the fee to an agent who assists a borrower?*"  *Id.* at 20,816.  The answer provided is that "an agent may collect from the lender for assistance in preparing an application for a PPP loan" a fee of not more than that set out in a schedule based on loan amount.  *Id.*  It made clear that "[a]gent fees will be paid by the lender out of the fees the lender receives from SBA" and not by the borrower or "out of the PPP loan proceeds."  *Id.*  The SBA was obviously concerned that supposed agents would take advantage of applicants in what was designed to be a simple, straightforward application process.  Notably, the SBA's First IFR does *not* state that lenders must pay agent fees regardless of whether work by an agent has been authorized by the lender and does not permit borrowers to hire agents at lenders' expense.  It merely sets a limitation on amount and source of payment, in the event there is an agreement to pay.  And of course, the IFR could not do anything more as that was the limit of the authority granted by Congress.

On April 22, 2020, shortly after the First IFR was released, the AICPA released a special report on the PPP *confirming* that potential agents understood that the First IFR did not create an entitlement to fees.  The report advises that "CPAs should note, that even though the Treasury has outlined guidelines related to agency fees, there is a possibility that you will not be paid for your services, even when noting you are an agent to the application . . . . It is important to discuss this issue with clients *and the banks* to ensure there is an understanding, preferably in writing, as to how and when any fees will be paid."  AIPCA Report at 3 (emphasis added).

**B.  The Agent Fee Cases**

On April 26, 2020, ServisFirst Bank and Synovus Trust Company, N.A.,[3] were sued by Sport & Wheat CPA PA in the first of the Agent Fee Cases.  Since then numerous other such cases have been filed, including those underlying the Motion, which name more than 80 alleged PPP lenders.  Plaintiffs have brought these cases as putative class actions in which agents claiming to have assisted clients in obtaining PPP loans from dozens of different banks seek to recover for all supposed such agents nationwide.  Plaintiffs' claim that billions of dollars are owed is based on the unsupportable presumptions that every single PPP loan involved an agent and that every single supposed agent would be entitled to a fee *and* that the fees would in every instance be the maximum fee permissible.  Plaintiffs have brought the suits underlying the Motion in ten different federal jurisdictions, claiming an entitlement to fees under the CARES Act, which does not include a private right of action.  The state law theories for plaintiffs' supposed entitlement to fees, based on the laws of ten different states, variously include conversion, unjust enrichment, quantum meruit, misappropriation, breach of contract, quasi-contract, unfair trade practices, and violations of state consumer protection and unfair trade practice laws.  All of those state law claims are based on the false theory that federal law creates an entitlement to fees and also fail for reasons specific to the various state law claims asserted.

**III.    LEGAL STANDARD**

The Panel is authorized to transfer civil actions "pending in different districts" to a single district "for coordinated or consolidated pretrial proceedings."  28 U.S.C. § 1407(a).  But transfer and centralization are not appropriate unless: (1) the civil actions involve "one or more common

---

[3] Although the original complaint named Synovus Trust Company N.A., the proper defendant entity is Synovus Bank.  *See* Am. Class Action Compl., *Sport & Wheat CPA PA v. ServisFirst Bank Inc.*, No. 3:20-cv-05425-TKW-HTC (N.D. Fla. May 27, 2020), ECF No. 21.

questions of *fact*"; (2) transfer will be "for the convenience of parties and witnesses"; and (3) transfer will "promote the just and efficient conduct of such actions." *Id.* (emphasis added). The party seeking consolidation bears the burden of showing that transfer "will further the purposes of Section 1407." *In re Cable Tie Patent Litig.*, 487 F. Supp. 1351, 1354 (J.P.M.L. 1980). Movant has not met and cannot meet its burden to establish any one of those purposes. Consolidation under Section 1407 "should be the *last solution* after considered review of all other options." *In re Best Buy, Co. Cal. Song-Beverly Credit Card Act Litig.*, 804 F. Supp. 2d 1376, 1378 (J.P.M.L. 2011) (emphasis added). An MDL for these cases would be a solution to nothing.

## IV.    ARGUMENT AND AUTHORITIES

### A.   Movant Cannot Meet Its Burden to Show that the PPP Agent Cases Involve Substantial Common Questions of Fact.

Centralization is inappropriate because these actions—in which different purported agents have sued different lenders in connection with different PPP applications, submitted at different times and places on behalf of different borrowers—do not implicate any common questions of fact. Even if these actions did implicate common questions of fact (and they do not), individual factual questions would predominate over common questions. If these actions have anything in common at all, it is a single fallacious legal theory:  that federal law *entitles* a supposed agent to a fee irrespective of whether the bank agreed to pay it a fee, or was even asked to consider approving a fee, and irrespective of the reasonableness of the claimed work, or whether the claimed fee is justifiable. However, as the Panel has made clear, the existence of common questions of law is not a basis for centralization.

**1.  The Agent Fee Cases Do Not Raise Common Questions of Fact.**

Mere numerosity of actions does not justify centralization.  *See In re Not-for-Profit Hospitals/Uninsured Patients Litig.*, 341 F. Supp. 2d 1354, 1356 (J.P.M.L. 2004).  If it did, then plaintiffs' counsel could manufacture an argument for an MDL simply by filing virtually identical lawsuits in various courts, as they attempt to do here.  Instead, only "civil actions involving one or more common questions of fact" may be centralized.  28 U.S.C. § 1407(a).  Movant cannot meet its burden to show common questions of fact here.

First, Movant does not demonstrate that these actions share *any* common questions of fact.  Defendants have in common only that they are financial institutions that are alleged to have made loans under the PPP.  Beyond that, other questions—such as whether lenders developed specific policies and practices with respect to agents—are highly individualized.  Some banks may not have developed any policies and practices at all.  To the extent others did, the questions of what those policies are, how they were implemented, and whether and how they were communicated to borrowers and agents will necessarily differ from institution to institution and from agent to agent.  Indeed, Movant itself alleges that these defendants have taken a variety of approaches to compensating purported agents, with some allegedly stating upfront that they will not pay agent fees, others allegedly paying less than the amounts supposedly required by the SBA's PPP rule, "and/or . . . effectively den[ying] payment" of such fees by somehow hindering agents from claiming fees.  *See* Mot. Ex. A (*Alliant* Compl. ¶ 46), ECF 1-6.

If any cases survive motions to dismiss, individualized determinations may include: (i) whether there were specific communications between or among the bank, borrower, and/or agent on the issue of agent fee payment; (ii) whether each borrower agreed to the agency and the

agreed terms, (iii) the specific services the agent provided,[4] (iv) the value of those services; and (v) whether the lender, as a matter of business judgment, decided to pay agent fees even though there is no legal requirement that it do so.  The degree to which an agent's services would be useful to a PPP applicant, and thus whether its claimed fee would be reasonable, will vary significantly based on the size of an applicant, its type of business, and the particular circumstances of the applicant.  And because the regulations set out a cap on agent fees but not a specific amount of fee that must be paid to agents, the value of each putative agent's assistance will be different and require a separate reasonableness analysis.  Thus, the relationship of each financial institution with the purported agents, each institution's implementation of the PPP and its communications, if any, with the agents, and the nature and value of any work performed by putative agents are all highly individualized.  In short, there are no *common* issues of fact across all of these cases.  *See In re Hotel Indus. Sex Trafficking Litig.*, 2020 WL 581882, at *2 (J.P.M.L. Feb. 5, 2020) (denying centralization of actions alleging that various hotel chains knowingly profited from sex trafficking, where "[t]he vast majority of actions involve different hotels,. . . different alleged sex trafficking ventures, different hotel brands, different owners and employees, different geographic locales, different witnesses, different indicia of sex trafficking, and different time periods," and where the absence of a "common or predominant defendant across all actions[] further indicat[es] a lack of common questions of fact"); *In re Mortg. Lender*

---

[4] When making Section 7(a) loans, including PPP loans, SBA requires "[t]otal compensation charged by an Agent or Agents to an Applicant for services rendered in connection with obtaining an SBA-guaranteed loan [to] be reasonable," 13 C.F.R. § 103.5(b), and requires agents paid in excess of $2,500 to provide, at minimum, "1) a detailed explanation of the work performed; and 2) the hourly rate and the number of hours spent working on each activity," SBA Form 159 (04-18) at 1.  Further, the SBA may also require itemization for amounts below $2,500, and all amounts must be reasonable.  The SBA Form 159 states: "Note: SBA, in its discretion, may request an itemization and supporting documentation for any fee charged in connection with an SBA loan application, regardless of the amount." *Id.* at 2.

*Force-Placed Ins. Litig.*, 895 F. Supp. 2d 1352, 1353–54 (J.P.M.L. 2012) (denying centralization of cases "involv[ing] not only different defendants but different lender agreements with insurers, different alleged abuses, and different mortgage loan documents").

Second, even if these cases were to raise some common factual issues, those common issues would not predominate.  To justify centralization, common issues must "*predominate* over individual factual issues."  *In re Westinghouse Elec. Corp. Emp't Discrimination Litig.*, 438 F. Supp. 937, 938 (J.P.M.L. 1977) (emphasis added); *see also In re American-Manufactured Drywall Prods. Liab. Litig.*, 716 F. Supp. 2d 1367, 1368 (J.P.M.L. 2010); *In re Pharmacy Benefit Plan Adm'rs Pricing Litig.*, 206 F. Supp. 2d 1362, 1363 (J.P.M.L. 2002).  As explained above, the circumstances of each and every claim to entitlement to a fee are specific to each plaintiff, defendant, and PPP loan transaction.  None of these issues is susceptible to coordinated discovery, let alone warrants centralization.  *See In re Pharmacy Benefit Plan Adm'rs Pricing Litig.*, 206 F. Supp. 2d 1362, 1363 (J.P.M.L. 2002) (finding transfer inappropriate where "unique questions of fact predominate over any common questions of fact"); *Westinghouse*, 438 F. Supp. at 938.  Centralization would thus neither eliminate nor streamline the pretrial process.  To the contrary, it would place upon one transferee court an undue burden that could be addressed more efficiently and with greater local expertise by the courts in which these actions were originally filed.

### 2. The Agent Fee Cases Contain, at Most, Common Questions of Law.

To be sure, these actions may raise some common questions *of law*.  But the existence of common questions of law is irrelevant for centralization purposes, because "common legal questions do not satisfy Section 1407's requirement of common factual questions."  *In re Veroblue Farms USA, Inc.*, 2020 WL 581888, at *2 (J.P.M.L. Feb. 5, 2020); *see also, e.g.*, *In re Nat'l Ass'n for Advancement of Multijurisdiction Practice Litig.*, 52 F. Supp. 3d 1377, 1378

10

(J.P.M.L. 2014) (finding that "common legal questions are insufficient to satisfy Section 1407's requirement of common factual questions"); *In re Medi-Cal Reimbursement Rate Reduction Litig.*, 652 F. Supp. 2d 1378, 1378 (J.P.M.L. 2009) (denying transfer and consolidation where the actions "by and large, raise strictly legal issues").

Here, the Agent Fee Cases all appear to present a common legal question: whether Congress enacted a statute that requires lenders, with no relationship to agents, to pay for services that such lenders never approved or authorized, without any consideration given to whether the services were actually performed or reasonable or the claimed fee is justifiable. The answer to that question is plainly no, and can be resolved by individual district courts in the ordinary course by reference to the operative statute and regulations.

The fact is that these plaintiffs do not even have the right to sue. The CARES Act does not contain an express private right of action. *Profiles, Inc. v. Bank of Am. Corp.*, 2020 WL 1849710, at *7 (D. Md. Apr. 13, 2020) ("[T]he CARES Act does not expressly provide a private right of action."). Plaintiffs in the underlying actions concede as much by seeking a declaratory judgment under the Declaratory Judgment Act, rather than the CARES Act itself. But the Declaratory Judgment Act does not create a private right of action either. *See, e.g.*, *Rebuild Nw. Fla., Inc. v. Fed. Emergency Mgmt. Agency*, 2018 WL 7351690, at *1 (N.D. Fla. July 12, 2018) (citing *Musselman v. Blue Cross & Blue Shield of Ala.*, 684 F. App'x 824, 829 (11th Cir. 2017)).

Nor does the CARES Act create an implied right of action. As courts have repeatedly held, the Small Business Act, which the CARES Act amends, does not confer a private right of action at all. *See Bulluck v. Newtek Small Bus. Fin., Inc.*, 2020 WL 1490702, at *3 (11th Cir. Mar. 27, 2020); *United States v. Fidelity Capital Corp.*, 920 F.2d 827, 838 n.39 (11th Cir. 1991). Nothing in the CARES Act changes this analysis, and the only court to address whether the

CARES Act itself creates a private right of action has held that it does not.  *See Profiles*, 2020 WL 1849710, at *7.

Even if the CARES Act created a private right of action, whether PPP lenders "must" pay agents is still fundamentally a question of law that turns on whether the statutory Fee Limit or regulatory guidance as to "Who pays the fee to an agent who assists a borrower?" created an affirmative entitlement to some fee.  *See* 15 U.S.C. § 636(a)(36)(P)(ii); 85 Fed. Reg. at 20,816. In a section captioned "FEE LIMITS," the CARES Act provides that "[a]n agent that assists an eligible recipient to prepare an application for a covered loan may not collect a fee in excess of the limits established by the Administrator."  15 U.S.C. § 636(a)(36)(P)(ii).  That is the entirety of the statutory language as it relates to agent fees:  an establishment of a limitation on agents' fees and an authorization to the SBA to establish those precise limits.  By contrast, the statute expressly mandates that lenders "shall be reimbursed" at a statutory rate for issuing the PPP loans.  Exercising the limited authority in regard to agent fees, the First IFR (1) sets out a schedule of maximum fees an agent may collect for assistance in preparing an application for a PPP loan, and (2) states that such fees will be paid by the lender out of the fees the lender receives from the SBA instead of by the borrower or out of the loan proceeds.  85 Fed. Reg. at 20,815.  Nothing in the First IFR requires a lender to pay agents' fees.  Just like the governing statute, it is a limitation only on amount and source.  Regardless, these common legal questions do not satisfy Section 1407's requirement of common *factual* questions.  *In re Veroblue Farms USA, Inc.*, 2020 WL 581888, at *2 (J.P.M.L. Feb. 5, 2020)

These cases also present many legal issues that are not common and must be resolved on a case-by-case basis.  In an apparent rush to create the appearance of complex litigation that would require centralization, plaintiffs filed bare-bones, scattershot complaints that raise

threshold legal issues such as standing, ripeness, personal jurisdiction, and even whether

plaintiffs have named proper entities.  *See, e.g., American Video Duplicating Inc. v. Citigroup*,

2:20-cv-03815-ODW-AGR (C.D. Cal. May 18, 2020), ECF No. 27-1.  In addition, each of the

various state law claims will vary by state.  Because individual district courts can easily resolve

these questions in dispositive motion practice, centralization of the Agent Fee Cases is not

appropriate.

### B.  Centralized Industry-Wide Litigation Is Not Warranted.

Plaintiff's centralization request should be denied for the additional reason that it is

nothing more than a feeble attempt to centralize litigation on an industry-wide basis, *i.e.*, based

on plaintiffs' election to sue multiple alleged PPP lenders.  But the Panel is "typically hesitant to

centralize litigation on an industry-wide basis."  *In re AndroGel Prods. Liab. Litig.*, 24 F. Supp.

3d 1378, 1379 (J.P.M.L. 2014).  "Industry-wide centralization should be the exception, not the

rule" in MDL cases because such actions are "exacerbated by centralization of multiple

defendants facing non-overlapping claims" and "[o]rganization of counsel, both for plaintiffs and

defendants, is challenging."  Chilton Davis Varner, *The Beginning of MDL Consolidation:*

*Should Cases Be Aggregated And Where?*, 37 REV. OF LITIG. 227, 234 (2018); *see, e.g., In re*

*Mortgage Industry Home Affordable Modification Program (HAMP) Contract Litig.*, 867 F.

Supp. 2d 1338, 1338 (J.P.M.L. 2012) (denying centralization because plaintiffs' allegations of

"similar industry-wide misconduct in mortgage origination, servicing, and foreclosure practices

against, collectively, over forty defendants" did not overcome the lack of common questions of

fact among all defendants).

Indeed, these cases are similar to other cases where this Panel has denied centralization of

industry-wide cases challenging the practices of financial institutions.  *See, e.g.*, *In re Credit*

*Union Checking Account Overdraft Litig.*, 158 F. Supp. 3d 1363, 1364 (J.P.M.L. 2016); *In re*

*Mortg. Lender Force-Placed Ins. Litig.*, 895 F. Supp. 2d 1352, 1352 (J.P.M.L. 2012); *In re Cred. Card Payment Protection Plan Mktg. & Sales Prac. Litig.*, 753 F. Supp. 2d 1375, 1375-76 (J.P.M.L. 2010). The Panel should deny consolidation of the Agent Fee Cases for the same reasons.

### C. Transfer Would Not Serve the Convenience of the Parties and Witnesses and Would Not Promote the Just and Efficient Conduct of the Actions.

The Panel often considers the second and third elements of the Section 1407 inquiry in tandem. The Panel finds that centralization may "serve the convenience of the parties and witnesses" and "promote the just and efficient conduct of the litigation" where it would accomplish such efficiencies as "eliminat[ing] duplicative discovery" or "conserv[ing] the resources of the parties, their counsel and the judiciary." *In re Airline Baggage Fee Antitrust Litig.*, 655 F. Supp. 2d 1362, 1362-63 (J.P.M.L. 2009). The mere presence of "some factual overlap," however, will not suffice where the pending actions may "proceed[ ] in an orderly manner" in their original jurisdictions. *In re Joel Snider Litig.*, MDL No. 2934, 2020 WL 1503250, at *1–2 (J.P.M.L. Mar. 27, 2020). Movants may not "rely on broad similarities among the actions to support their request for centralization" where—as here—differences give rise to "unique issues" that "predominate" over alleged common issues. *In re Hotel Indus. Sex Trafficking Litig.*, 2020 WL 581882, at *2.

### 1. Dispositive Motion Practice Offers a Reasonable Prospect to Weed Out Claims.

The Panel has long recognized that it should not centralize cases when, as here, dispositive motion practice offers a reasonable prospect to weed out claims and reduce the number of plaintiffs and cases. *See In re ATM Interchange Fee Antitrust Litig.*, 350 F. Supp. 2d 1361, 1362–63 (J.P.M.L. 2004); *In re The Boeing Company Emp't Practices Litig.*, 293 F. Supp. 2d 1382, 1383 (J.P.M.L. 2003). Several dispositive motions are currently pending in the courts

of original jurisdiction, and transfer is likely only to slow this process down.  This is an instance in which "motions to dismiss or remand, raising issues unique to the particular case, may be particularly appropriate for resolution before the Panel acts on the motion to transfer."  Manual for Complex Litigation, Fourth § 20.131 (2004).

> **2.  Other Avenues Should Be Exhausted Before Invoking Centralization.**

Where there are "a relatively small number of actions" and procedural solutions short of centralization under Section 1407 offer a "reasonable prospect" to "eliminate the multidistrict character" of the litigation, the Panel should allow these other avenues to be exhausted before invoking the "last solution" of centralization under Section 1407.  *In re First Am. Fin. Corp. Customer Data Sec. Breach Litig.*, 396 F. Supp. 3d 1372, 1373 (J.P.M.L. 2019) (denying motion to centralize 14 actions, where parties also notified Panel of seven potential tag-along actions).  Here, even in the unlikely event that any of these actions survives a motion to dismiss, the surviving Agent Fee Cases can readily be managed on an individual case basis through procedural avenues short of centralization.  For instance, parties may file a related case statement if they believe an earlier filed case is related to a prior filed case in a district court, and that proceedings should be coordinated, which is precisely what plaintiffs to one of the Related Actions to this putative MDL recently have done.  *See Fahmia, Inc. v. MUFG Americas Holding Co., et al.*, 1:20-cv-04145 (S.D.N.Y. June 2, 2020), ECF No. 7.  "[I]nformal coordination and cooperative efforts by the parties and involved courts should be sufficient to minimize or eliminate duplicative discovery and other pretrial proceedings."  *In re 3M Co. Lava Ultimate Prods. Liab. Litig.*, 222 F. Supp. 3d 1347, 1348 (J.P.M.L. 2016).  This is especially so here, where the same group of plaintiffs' counsel filed most of these cases.

### 3. Transfer Would Cause the Parties—Especially Defendants Sued In Few Actions—Unnecessary Expense and Inconvenience.

Transfer cannot "serve the convenience of the parties and witnesses" and "promote the just and efficient conduct of the litigation" given the logistical burdens it would likely impose on the parties and witnesses and the added expense it will cause defendants. Centralization would require counsel for the more than 80 parties—most of which have been named as defendants in just a few suits typically filed where, or near where, those parties are located—to travel to a potentially distant location for MDL proceedings. These defendants will almost certainly face substantially increased litigation costs resulting from participating in MDL proceedings in a distant forum, as compared to expeditiously litigating their cases on an individual basis near where they are located. And given the factual dissimilarities among cases and defendants, there is no reasonable prospect of coordinated discovery. There are no efficiencies to be gained by forcing a defendant—especially a relatively small defendant—that is sued in only one or a few actions into a large complex MDL proceeding.

### 4. Plaintiffs Are Trying to Force the Panel to Solve Problems of Counsel's Own Making.

Movant contends that centralization would avoid "what otherwise could become a chaotic litigation," or "a sprawling litigation that is unjust, inefficient, and unmanageable." (Mot. 11–12.) These fears are unjustified, but more importantly, the specter is a creation of Movant's counsel themselves. Movant's counsel (whether together or in combination with other counsel) filed the lawsuits in various different courts, and they presumably believed themselves capable of litigating in the courts where they chose to file. Any "chaos" or "sprawl" would result solely from the decision by Movant's Counsel to file substantially identical complaints in multiple federal districts, in a transparent attempt to justify centralization by creating the appearance of complex litigation. "[T]he convenience of parties and witnesses" and "the just

16

and efficient conduct of the litigation," *id.* at 11, do not require the Panel to spare plaintiffs the possible costs of counsel's own litigation strategy, at Defendants' expense.

**D.  If Any Defendant Supports Centralization, the Panel Can Create a Defendant-Specific MDL.**

A few defendants have been sued in many Agent Fee Cases.  If any of those defendants supports centralization, the Panel should separate and centralize those claims involving that specific defendant, while allowing the claims against other defendants to proceed in the jurisdictions where they were filed.

Section 1407 authorizes the Panel to "separate any claim, cross-claim, counter-claim, or third-party claim and remand any of such claims before the remainder of the action is remanded."  28 U.S.C. § 1407(a).  Consistent with this directive, the Panel has excluded from centralized proceedings claims against some defendants when, as here, the claims are distinct and centralization would complicate MDL proceedings.  *See, e.g.*, *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 812 F. Supp. 2d 1380, 1383 (J.P.M.L. 2011); *In re Light Cigarettes*, 652 F. Supp. 2d 1379, 1380-81 (J.P.M.L. 2009); *In re Bank of Am. Home Affordable Modification Program (HAMP) Contract Litig.*, 746 F. Supp. 2d 1359, 1361 (J.P.M.L. 2010). Following that approach here strikes the right balance between allowing any defendants that support centralization to benefit from their hopes that efficiencies might result from a defendant-specific MDL, while avoiding imposition of burdens and inefficiencies that will afflict other defendants that have been sued in a few actions if they are swept into an industry-wide MDL.

**E.  If the Panel Does Grant the Motion and Creates An Industry-Wide MDL, the Related Actions Should be Centralized in the Northern District of Georgia.**

If the Panel grants the motion to transfer—and it should not—the undersigned do not object to consolidating the Related Actions in the Northern District of Georgia.  As the Movants themselves explain, centralization in the Northern District of Georgia makes the most sense, if

these actions are to be centralized.  (*See* Mot. at 13-17.)  Because "no single district stands out as a geographic focal point," *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 269 F. Supp. 2d 1372, 1373 (J.P.M.L. 2003), the Panel should consider a transferee court that is economical and convenient to the parties, and that has the capacity to take on this proceeding.[5]

The Northern District of Georgia would be a convenient and economical location for all parties and their counsel.  The main Northern District of Georgia federal courthouse is located in Atlanta, which is also the headquarters of a number of financial institutions involved in these actions.  Counsel for many of the defendants are located in the Southeast and along the Atlantic seaboard, with counsel for others located near major metropolitan airports across the United States.  This District is conveniently located with access to the Hartsfield-Jackson Atlanta International Airport, a hub for many major U.S. airlines servicing thousands of arrivals and departures daily from cities across the country.  The federal courthouse in the Northern District of Georgia is accessible within minutes from Atlanta's airport via car or the MARTA mass transit system.  If transfer is ordered, then both the locations of the parties and the forum's accessibility make the Northern District of Georgia well suited as the transferee district for this litigation.

---

[5] Neither the Southern District of New York nor the Central District of California would be convenient or efficient forums for centralization.  Although there are three agent fee cases in the Southern District of New York, they were filed by the same attorney on behalf of two plaintiffs.  In California, the same attorney filed three of the cases.  This appears to be yet another attempt to create the appearance of numerosity in New York or California, and the Panel should not countenance such blatant forum shopping.   In any event, the Southern District of New York already has 17 pending MDLs, and other districts are likely better equipped to handle an MDL assignment.

The Northern District of Georgia is also experienced with handling MDLs and currently has sufficient resources to take on a new case, with only four currently pending MDLs.[6]  And if centralization occurs in the Northern District of Georgia, there is no reason to reassign these cases to a different judge.  When Judge May recused herself from the case after Movants filed their Motion, the case was reassigned to Judge Michael L. Brown.  Judge Brown is a similarly capable jurist, and he currently does not have any MDL proceedings on his docket.

Movants have secondarily suggested the District of Arizona, but that forum is far less convenient as compared to the Northern District of Georgia.  Notably, far fewer of the defendants in the Related Actions have ties to Arizona, and none of the main defendants' counsel is headquartered in or near Arizona.  Litigating in Arizona would thus require substantial travel for all of the defendants, key witnesses, and defendants' counsel.  Furthermore, the District of Arizona takes almost twice as long to dispose of civil cases than does the Northern District of Georgia.[7]

## V.    Conclusion

For the foregoing reasons, the undersigned Defendants respectfully request that the Panel deny the Motion.

---

[6] *See* MDL Statistics Report - Distribution of Pending MDL Dockets by District, as of May 15, 2020, available at https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_ Dockets_By_Actions_Pending-May-15-2020.pdf.

[7] *See* United States District Courts, National Judicial Caseload Profile, available at https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2019.pdf (last visited June 12, 2020).

19

Dated:  June 17, 2020                              Respectfully submitted,


*/s/ Paul J. Nathanson*

Paul J. Nathanson
  District of Columbia Bar #982269
DAVIS POLK & WARDWELL LLP
901 15th Street, N.W.
Washington, D.C. 20005
paul.nathanson@davispolk.com
(202) 962-7000

*Counsel for Defendant Synovus Bank*


*/s/ Benjamin J. Razi w/ permission*

Benjamin J. Razi
  District of Columbia Bar # 475946
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
brazi@cov.com
(202) 662-6000

*Counsel for Defendant Ameris Bank*


*/s/ Andrew Soukup w/ permission*

Andrew Soukup
  District of Columbia Bar #995101
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
asoukup@cov.com
(202) 662-6000

*Counsel for Defendants Celtic Bank Corp. d/b/a
Celtic Bank, MUFG Union Bank N.A., and
MUFG Americas Holding Co.*

*/s/ Ashley M. Simonsen w/ permission*

Ashley M. Simonsen
  California Bar #275203
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
asimonsen@cov.com
(424) 332-4800

*Counsel for Defendant City National Bank*

*/s/ Nathaniel Lampley, Jr. w/ permission*

Nathaniel Lampley, Jr.
  Ohio Bar #0041543
VORYS, SATER, SEYMOUR AND PEASE
LLP
301 East Fourth Street
Great American Tower, Suite 3500
Cincinnati, Ohio 45202
nlampley@vorys.com
(513) 723-4616
(513) 852-7869 (facsimile)

*Counsel for Defendants Fifth Third Bank,*
*National Association and Fifth Third Bancorp*

*/s/ Roy W. Arnold w/ permission*

Roy W. Arnold
  PA I.D. 70544
BLANK ROME LLP
501 Grant Street, Suite 850
Pittsburgh, PA 15219
rarnold@blankrome.com
(412) 932-2800
(412) 932-2777 (facsimile)

*Counsel for Defendants First National Bank of*
*Pennsylvania and F.N.B. Corp.*

*/s/ Casey B. Howard w/ permission*

Casey B. Howard
LOCKE LORD LLP
Brookfield Place
200 Vesey Street, 20th Floor
New York, NY 10281-2
choward@lockelord.com
(212) 415-8600

*Counsel for Defendant Harvest Small Business Finance, LLC*

*/s/ Elaine Golin w/ permission*

Elaine Golin
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
EPGolin@wlrk.com
(212) 403-1000

*Counsel for Defendants Huntington Bancshares Incorporated and The Huntington National Bank*

*/s/ Christopher M. McLaughlin w/ permission*

Christopher M. McLaughlin
  Ohio Bar No. 0078186
JONES DAY
North Point, 901 Lakeside Avenue
Cleveland, OH 44114-1190
cmmclaughlin@jonesday.com
(216) 586-7507

*Counsel for Defendants KeyCorp and KeyBank N.A.*

*/s/ Henry L. Kitchin, Jr. w/ permission*

Henry L. Kitchin, Jr.
MCGUIREWOODS LLP
300 North Third Street, Suite 320
Wilmington, North Carolina  28401
hkitchin@mcguirewoods.com
(910) 254-3800
(910) 254-3900 (facsimile)

*Counsel for Defendant Live Oak Banking Company*

22

*/s/ James R. McGuire w/ permission*

James R. McGuire
BUCKLEY LLP
555 California Street, Suite 4925
San Francisco, CA 94104
jmcguire@buckleyfirm.com
(415) 619-3415

*Counsel for Defendant MidFirst Bank*

*/s/ Ryan S. Lett w/ permission*

Ryan S. Lett (0088381)
FROST BROWN TODD LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
(513) 651.6800 Telephone
(513) 651.6981 Facsimile
rlett@fbtlaw.com

*Counsel for Defendant The North Side Bank &
Trust Company*

*/s/ Jonathan M. Moses w/ permission*

Jonathan M. Moses
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
JMMoses@wlrk.com
(212) 403-1000

*Counsel for Defendants PNC Financial Services
Group, Inc. and PNC Bank N.A.*

*/s/ Logan T. Matthews w/ permission*

Logan T. Matthews
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
lmatthews@lightfootlaw.com
(205) 581-0700

*Counsel for Defendant ServisFirst Bank*

23

*/s/ Cheryl L. Haas w/ permission*

Cheryl L. Haas
  Georgia Bar No. 316081
MCGUIREWOODS LLP
1230 Peachtree Street, N.E., Suite 2100
Atlanta, GA 30309
chaas@mcguirewoods.com
(404) 443-5500
(404) 443-5599 (facsimile)

*Counsel for Truist Bank and Truist Financial Corporation*

*/s/ Michael S. Kraut w/ permission*

Michael S. Kraut
MORGAN, LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178-0060
michael.kraut@morganlewis.com
(212) 309-6000
(212) 309-6001 (facsimile)

*Counsel for Defendants U.S. Bancorp and U.S. Bank National Association*